FRANK HARMER V. STATE OF NEBRASKA.

FILED OCTOBER 24, 1930. No. 27553.

*D. W. Livingston*, for plaintiff in error.

*C. A. Sorensen, Attorney General*, and *Clifford L. Rein*, contra.

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and DAY, JJ.

EBERLY, J.

The plaintiff in error, hereinafter referred to and designated as the defendant, was convicted in the district court for Otoe county of unlawfully stealing chickens of the value of $25, the property of one Wiebusch. It is charged that this offense was committed on the 25th day of January, 1930. From the conviction and the sentence imposed thereunder the defendant prosecutes error.

The record discloses that by plea in abatement, duly presented at the time of his trial in the court below, the defendant challenged the sufficiency of the evidence heard by the examining magistrate at the time of the preliminary examination as being wholly insufficient to support the finding that a crime had been committed and that there was probable cause to believe that the defendant committed it. The state demurred to this plea and its demurrer was sustained by the district court. On the trial of the case, at the conclusion of the state's evidence, the defendant moved for a directed verdict based upon the insufficiency of the evidence presented by the state to justify conviction, which

motion was overruled. At the conclusion of all of the evidence a similar motion was again presented and again denied by the district court.

While defendant contends that certain other errors were committed by the trial court, he still relies upon his contention that the evidence is wholly insufficient to sustain the conviction, and it is thought that a proper determination of this question will render further discussion of the case before us superfluous.

It appears from the record that the defendant is 45 years of age, and at the time of the trial had resided in Otoe county and had been engaged in farming therein during his entire life. He owned the quarter section which he was farming and on which he resided. This land is situated seven miles south and two and one-half miles west of Avoca. The home of the complaining witness from which it is alleged the defendant stole the chickens is situated four miles east and one-half mile north of Otoe. Highway No. 50 connects Syracuse, Otoe, Avoca, and Weeping Water. The home of the complaining witness is situated east of this highway, and is approximately six miles east of the home of the defendant.

On the Wiebusch farm, on the date set forth in the information charging the offense, there were two chicken houses of approximately equal size, one situated 300 or 400 feet north of the residence thereon and the other an equal distance east of the house. On this farm during the season of 1929 there had been raised light Brahmas, Rhode Island Reds, White Rocks, Buff Orphingtons, and Minorcas, as well as mixed chickens. Some of each of the varieties named were kept in each chicken house with the possible exception of the Minorcas. There was no obstruction, such as fences, etc., which in any manner prevented the chickens of the two houses from passing and repassing between the same and intermixing.

At the trial the state introduced the evidence of the agent in charge of the Beatrice Creamery Company station at Weeping Water, Cass county, Nebraska. A part of the business of this firm at that point was dealing in poultry.

The agent of this company testified that the defendant on January 25, 1930, sold and delivered to him 19 light Brahma chickens which are now claimed as the property of the complaining witness. As to the time of day when this transaction occurred he testified: "Why, it was late afternoon, between 4 and 6 o'clock; somewhere along there. I never paid much attention to the time." On cross-examination on this subject this witness further stated with reference thereto: "Q. What time in the evening did you say he delivered those chickens to you? A. Oh, it was between 4 and 6 o'clock. Q. Between 4 and 6. You testified in the lower court, did you not? A. Yes, sir. Q. At that time was this question asked you and this answer given by you: (Question) 'You told the sheriff that he was at your place last Saturday afternoon sometime between 5 and 5:30?' (Answer) 'Yes, sir.' Was that question asked, that answer given? A. I think it was. Q. Was this question asked you, and this answer given by you in the lower court: (Question) 'Was it before dark?' (Answer) 'Yes; it was just growing dusk when he was there, when he left.' Is that correct? A. Yes, sir. Q. And that was the time that he came there? A. As near as I can remember. Q. Whatever the hour was, it was growing dark? A. Yes, sir."

Mrs. Wiebusch, as to the vital facts of the situation, appears as the state's sole witness. Her testimony supports the conclusion that on Saturday, January 25, 1930, she had been at home all day. She states that around 7 o'clock p. m. that day she, with her husband and family, left their home and proceeded to the village of Otoe in their automobile. They returned home "around 10 o'clock." At that time they discovered an automobile standing north of the house without lights. When the automobile in which she and her family were riding approached near their home the strange car started north along a gravel highway there situated. The witness, with her husband and children in the automobile followed rapidly until they got close enough to light up and read the numbers thereon, which numbers, she testified, were the numbers on the defendant's car. On

cross-examination she stated that it was "after 10 o'clock"· when they arrived home from chasing the car, and that they had followed the car along the gravel road leading north "a good mile;" that they discovered there was a single man in the car, but could not recognize him; that they heard no chickens in the car which they followed, and in fact there is no evidence that chickens were contained in this car at that time. It also cannot be ascertained with any certainty whether this strange car was, at the time of its discovery by the complaining witness, on the gravel road, in the yard of the home, or in the vicinity of the north chicken house. Mrs. Wiebusch also testified that she had counted the chickens in the north chicken house two weeks before Christmas and at that time she had 165 therein; that these chickens were not counted again until Sunday, January 26, 1930, and at that time she found she had 112; that on the 27th of January, 1930, she and her husband, and Mr. Rich, the sheriff, went to Weeping Water, where she saw the 19 light Brahmas at the Beatrice Creamery Company station, which they took home with them when they returned. On arriving at their home these 19 light Brahmas were turned out about 50 feet southwest of the north chicken house and "fourteen of them (went) right straight to the scratching pen and five stopped by a little pile of hay and started scratching there." On cross-examination this witness testified that she did not know how many chickens she had raised in 1929, did not know how many of each variety of chickens she had; that there were no markings of any kind on the chickens recovered from Weeping Water, other than that of breed, except a band on one rooster's leg; that she did not know who put the band on and did not know where it came from; that she did not miss this rooster with the band on until Monday when they brought him back with the other chickens from Weeping Water; that she had never seen any Brahma chickens at any time save and except those raised by her on her own place, but because the chickens found at Weeping Water looked like hers they were hers; that she did not know how many Brahma chickens she raised in 1929,

and did not know how many Brahma chickens, out of the 165 she counted two weeks before Christmas, were in the north chicken house; that she is willing to and did swear that the large rooster with the band is her property because of the size, actions, comb, and because her chickens had white diarrhea and she observed that one of the light Brahmas was afflicted in like manner when she examined the nineteen at Weeping Water. She details at some length the actions of the nineteen chickens when returned to her home place and there turned loose. There is no evidence of any kind corroborating the complaining witness in her statements. Although the evidence discloses that the husband was with her at the time of the discovery and pursuit of the strange car and the time that the numbers were ascertained, and he was a witness sworn at the trial, his testimony is limited to the statement that he was the husband of Mrs. Wiebusch, that he had sold no chickens since two weeks before Christmas and had given no one permission to take any of his chickens away. There is no evidence in the record given at the trial of the case in the district court as to how many chickens were on the farm at the time the chickens were counted in the north chicken house two weeks before Christmas. There is no evidence as to how many light Brahma chickens were on the farm either at that time or on the 26th of January, 1930, when the chickens in the north chicken house were again counted and found to be no more than 112, and that she had never missed any chickens out of a flock of 165 until January 26, 1930.

The defendant wholly denied the crime charged, and further testified that from 350 to 400 chickens were raised on his farm in 1929, a part of which consisted of light Brahma chickens, and the chickens in controversy by him sold were raised on the farm and were marketed by him on Saturday, January 25, 1930; that these chickens were sold and delivered to the Beatrice Creamery Company station between 5 and 6 o'clock on that day; that neither he nor his car were at the complaining witness' home on the day or evening of January 25, 1930. As to the raising and

possession of light Brahma chickens on his farm prior to the 25th day of January, 1930, the defendant is fully corroborated by the evidence of two witnesses, one of whom noticed the band which was on the leg of a Brahma rooster. These witnesses were not in any manner impeached. Defendant also accounts for his whereabouts during the entire evening of January 25, 1930, by evidence which, if believed, would fully establish the fact that he was not on that day, especially in the evening, at or near the home of the complainant. None of this evidence is in any manner contradicted, save and except by the uncorrobrated evidence of the complaining witness, and that limited to the fact that at about 10 o'clock in the evening of January 25, 1930, a car bearing defendant's license number was discovered by her and her husband as hereinbefore recited.

Without further discussion, it may be said that the identification of the chickens by the uncorroborated evidence of the complaining witness is not satisfying, and the record taken as an entirety certainly creates more than reasonable doubt on this feature of the case. On one point, however, there can be no question, for all witnesses agree, and that is the chickens were sold and delivered at Weeping Water, some distance from the home of the complaining witness, between 4 and 6 o'clock p. m. on Saturday, January 25, 1930. The complaining witness and her family were home, and, so far as the record before us discloses, no opportunity was afforded any one to remove the chickens therefrom until after 7 o'clock p. m. when she and her family left for Otoe. The only evidence connecting the defendant with the situation is the evidence that she saw an auto carrying his license number on the premises about 10 o'clock p. m., Saturday, January 25, 1930. There is no evidence of any chickens missing until disclosed by the count made Sunday, January 26, 1930. It certainly must be conceded to be a physical impossibility for the defendant to have sold at 6 o'clock p. m. chickens which could not have been stolen by him except between 7 and 10 o'clock p. m. on the same day.

The commission of a crime cannot be assumed; it must be established by due proof. All of the pertinent transactions and matters referred to in the record took place on the 25th of January, 1930, or thereafter; so we are limited to the consideration of the evidence as to what occurred on that day only. In this view of the case, there is no question that the evidence conclusively establishes the innocence of the defendant and is wholly insufficient to sustain the verdict of guilty, and the district court erred in denying the defendant's motion for a directed verdict.

It therefore follows that the judgment herein must be and hereby is reversed, the information dismissed, and the defendant discharged.

REVERSED AND DISMISSED.